UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LINDA MEDLEY,

      Plaintiff,

v.

DISH NETWORK L.L.C.,

      Defendant.

_____/

Case No.: 8:16-cv-02534-CEH-CPT

## DEFENDANT DISH NETWORK L.L.C.'S MOTION FOR REMITTITUR

Pursuant to Federal Rules of Civil Procedure Rule 50(b) and 59(a)(1), DISH Network L.L.C. ("DISH") brings this Motion on the grounds that the $225,000 punitive damages award is: (1) excessive and violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and should be reduced to a 1:1 ratio with the compensatory damages award, and in no event should be permitted to exceed a 4:1 ratio; and (2) to the extent a 1:1 punitive to compensatory damage ratio is not used, the punitive damage award should be remitted under Florida Statute § 768.74(5).

DISH brings this Motion only as an alternative should the Court deny DISH's separately filed Motion for Judgment as a Matter of Law as to the issue of punitive damages.

## I.   **FACTS & PROCEDURAL POSTURE**

### A. Relevant Facts Regarding the Notices of Representation.

The Court is very familiar with the facts at this point. But given the substantial narrowing of remaining facts and issues from trial, to summarize in relevant part, Plaintiff filed for bankruptcy in May of 2014. During Plaintiff's bankruptcy and before her discharge, DISH wrote off her debt. (*See* Joint Exhibit 7, note dated Aug. 23, 2014.) As the Court is aware, however, DISH viewed Plaintiff's post-bankruptcy charges as a new debt, separate and independent of the amount of debt encompassed within Plaintiff's bankruptcy.

On October 1, 2014, DISH sent Plaintiff a billing statement by email regarding the post-bankruptcy debt. (Joint Exhibit 5(B).) On October 15, 2014, Plaintiff's counsel sent DISH a fax Notice of Attorney representation. (*See* Pltf. Exhibit 13(A).) The header of the fax contained the caption of Plaintiff's bankruptcy, including the matter name, bankruptcy case number, and date of filing. The body of the fax stated, in relevant part:

> Please be aware that this law firm (see above for contact information) represents Linda Medley with regard to her debts generally (i.e. for the purpose of settling ALL of her debts for filing a bankruptcy), including the above listed account and any other accounts of debts which you or your agency is attempting to collect from our client(s). Any further communication with our client(s) will be in violation of Fla. Sta. § 559.72(18), which provides in part that:
>
> > "[I]n collecting consumer debts, no person shall communicate with the debtor if that person knows that the debtor is represented by an attorney with respect to such debt and has knowledge of...such attorney's name and address."

After this initial fax and up through December 29, 2014, DISH sent three emails to Plaintiff regarding her bill. (*See* Joint Exhibits 6(B)-(D).) DISH also made, at most, two phone calls to Plaintiff regarding her debt. (Tr., Jury Trial – Day 3, Morning Session, pg. 44:5-15.)[1]

On December 30, 2014, Plaintiff's counsel sent an identical fax to DISH. (*See* Pltf. Exhibit 13(B).) DISH sent two additional emails to Plaintiff, on January 14 and February 13, 2015. (Joint Exhibits 6(E) and 6(F).) However, only the January 14 statement requested payment. (Joint Exhibit 6(E).) The February 13, 2015, statement reflected that DISH wrote off the account and advised "No Payment Due." (Joint Exhibit 6(F).)

On February 16, 2015, Plaintiff's counsel sent a third fax. (Pltf. Exhibit 13(C).) However, DISH had already written off Plaintiff's debt by that time and there were no communications sent to Plaintiff after that date. (Tr., Jury Trial – Day 3, Afternoon Session, pg. 36:1-4.)

---

[1] While DISH made a total of six calls after October 15, 2014, DISH's witness testified that only one related to Plaintiff's bill. (*Id.*) DISH's representative testified that the remainder were calls about account information, though acknowledged that one additional call (October 24, 2014) might have included information regarding making a payment, but he did not recall. (*Id.* at 79:19-80:21.) This is consistent with Plaintiff's handwritten log regarding the substance of the calls. (*See* Joint Exhibit 11, notes dated October 24 and November 26, 2014). As such, for purposes of this Motion, DISH will more broadly assume two calls were an attempt to collect the debt.

In total, after the first fax of October 15, 2015, *at most*, DISH sent Plaintiff five emails and made two phone calls that sought payment of the debt.[2] Plaintiff agreed that the emails and phone calls were "short," taking about a minute to review. (Tr., Jury Trial – Day 2, Morning Session, pp. 85:23-86:25, 90:4-6.)

Plaintiff's testimony regarding her alleged distress from these few emails and phone calls, in full, is that: (1) "my heart would start racing and I would feel shaky and scared, nervous" (*Id.* pg. 33:4-5; *see also id.* pg. 40:18-20 (same)); and (2) she was "worried." (*Id.* pp. 35:6-7, 37:22, 40:20, 42:10-11.)

### B. DISH's Policy for Honoring Notices of Representation and Application to this Case.

Despite Plaintiff's suggestion, the faxes of representation were not "thrown in the trash." (*See* Tr., Jury Trial, Day Two Afternoon Session, pg. 89:2-4.) DISH has a policy in place for processing and honoring notices of attorney representation. (Tr., Jury Trial - Day 2, Afternoon Session, pp. 110:22-112:16.)

But, as the Court is aware, the subject header of the faxes specifically identified Plaintiff's bankruptcy case and the letter stated that Plaintiff was

---

[2] During trial, Plaintiff argued that, even before her counsel sent the faxes, DISH contacted Ms. Medley during and after her bankruptcy despite knowing she was represented by counsel. However, the Jury found that DISH did not knowingly attempt to collect an unlawful debt after Plaintiff filed her bankruptcy petition. By extension, the Jury's finding regarding DISH's lack of knowledge as the validity of the Pause charges logically necessitates that DISH did not know Plaintiff was represented by counsel with respect to the Pause charges until, at the earliest, after the first fax of October 15, 2014.

represented by counsel for purposes of settling her debt filing bankruptcy. As such, because DISH had already written off Plaintiff's debt, thought the post-bankruptcy Pause charges were separate, and did not view the faxes as including the post-bankruptcy Pause debt, DISH took no other action, believing it had already honored the faxes. (*Id.*; *see also id.* at pp. 89:2-90:17.)

Plaintiff argued that DISH should have read the faxes differently because, despite the overall context, they included a line about representing Plaintiff with respect to other debts. But as this Court previously held with respect to the faxes:

> The faxes specifically pertain to Medley's bankruptcy-related debts. By adding the "i.e.", or, in other words, "that is" parenthetical, Medley's counsel defined the scope of the debts that fell under his representation. ***Although the scope appears expansive based on the clause that follows the parenthetical, the clause simply clarifies that the bankruptcy-related debts include the listed account as well as any other debt that fell within the purview of her bankruptcy.*** The faxes are evidence that Medley was represented by counsel in connection with her bankruptcy proceeding, and thus, pre-petition debt. Accordingly, Dish did not have actual knowledge that Medley was represented by counsel with respect to the specific debt, post-petition debt, that it attempted to collect and it is entitled to summary judgment on Count III.

*Medley v. Dish Network, LLC*, No. 8:16-cv-2534-T-36TBM, 2018 U.S. Dist. LEXIS 144895, *25 (M.D. Fla. Aug. 27, 2018). Notably, while the Eleventh Circuit reversed on the basis that the Pause charges were not a separate debt from Plaintiff's bankruptcy (thus, blending the issue of DISH's knowledge with

respect to the Pause debt in with the faxes of representation), the panel expressed no disagreement with the Court's interpretation of the scope of the faxes.

Regardless, and while DISH recognizes the Jury's verdict is independent of this Court's prior summary judgment order, DISH respectfully submits that this Court's prior agreement with DISH's interpretation of the faxes bears on the relevant factors in considering whether the punitive damages award is unreasonable based on the facts and circumstances of this case.

### C. The Jury's Award.

The Jury found in favor of DISH on Plaintiff's claim alleging that DISH knowingly attempted to collect an unlawful debt. (Dkt. 283, PageID 6638.) The Jury, however, found that DISH contacted Plaintiff after having actual knowledge that she was represented by counsel with respect to the debt. (*Id.*)

Based on the few emails and phone calls, the Jury awarded Plaintiff $8,750 in compensatory damages. (*Id.* PageID 6639.) The Jury then awarded Plaintiff $225,000 in punitive damages, an amount nearly 26 times greater than the compensatory damage award. (*Id.* PageID 6640.)

DISH has separately moved for judgment as a matter of law on the punitive damage award. To the extent that motion is not granted, DISH requests that the Court reduce the award on the basis that: (1) it is excessive and unconstitutional

under the Due Process Clause of the Fourteenth Amendment; and (2) to the extent the Court does not reduce punitive damages to a 1:1 ratio with compensatory damages as a due process matter, should be further reduced under Florida law.

II.     **LAW & ARGUMENT: THE PUNITIVE DAMAGES AWARD IS EXCESSIVE AND VIOLATES THE DUE PROCESS CLAUSE**

    **A. DISH's Due Process Argument is matter of law and not based on the specific facts of the case.**

DISH's Due Process argument is determined under Federal Rule of Civil Procedure 50, and is not considered a discretionary motion for remittitur.

> A constitutionally reduced verdict, therefore, is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is unreasonable on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court and which we review for an abuse of discretion, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Johansen v. Combustion Eng'g., Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999) (citations omitted).

    **B. Standard for determining whether a punitive damage award is Constitutionally excessive.**

"The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am.*

*v. Gore*, 517 U.S. 559. 562 (1996). The Constitution provides an upper limit on punitive damage awards so that a person has "fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *Id.* at 574.

The Supreme Court established three "guideposts" by which a court must evaluate whether a punitive damage award is constitutionally excessive: (1) the degree of reprehensibility of the conduct; (2) the disparity (or ratio) between the plaintiff's actual damages and the punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Id.* at 574-75.

As the Eleventh Circuit summarized in discussing *BMW* and its progeny:

> The take-away from the above Supreme Court cases is as follows. Whether it is a civil or criminal proceeding, the Due Process Clause requires that a defendant be put on fair notice of the severity of the punishment that might be imposed on him for his misconduct. When the punitive damages award in a civil proceeding is grossly excessive in relation to the relevant state interest underlying prohibition of the particular conduct at issue, the civil defendant has not received fair notice and the award is therefore unconstitutional.

*Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 749-50 (11th Cir. 2020).

As detailed below, the Jury's $225,000 punitive damage award is grossly excessive. DISH's conduct, sending five emails and making two phone calls, based on a mistaken interpretation of the faxes, is not reprehensible conduct. The ratio of punitive damages to compensatory damages, nearly 26:1, is constitutionally excessive. The punitive damages should be reduced to a 1:1 ratio, and at the very least there is nothing that would support going above a 4:1 ratio.

### i. Even if punitive damages were warranted, the conduct was not reprehensible, or at most, was minimally so.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. … This principle reflects the accepted view that some wrongs are more blameworthy than others." *Gore*, 517 U.S. at 575.

In determining reprehensibility, the Court should consider whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003), *citing Gore*, 517 U.S. at 575.

As to the first factor (type of harm), emotional distress may be considered a type of physical harm. *See Williams*, 947 F.3d at 751. Regardless, "there was no serious or life-threatening physical harm" in this case. *Id.* Plaintiff's alleged distress, consisting of nothing more than saying she was "worried" and that her "heart would start racing" a few times, is not substantial harm. This is not a case where Plaintiff's alleged distress flowed from conduct such as being "wrongly identified as a criminal," *see id.*, falsely threatened with arrest, having a home wrongfully foreclosed upon, or the like. (*See* Section III.C., *infra*.)

As to the second factor, there is no evidence of indifference or reckless disregard to health and safety of others. Importantly, this factor is not satisfied simply because a plaintiff has suffered some damage. *See id.* (reversing district court's finding that second factor was satisfied based on the plaintiff's emotional distress, concluding "that is accounted for in the first factor, discussed above").

There is no evidence that shows indifference or reckless disregard by DISH. Respectfully, it bears pointing out again that this Court previously agreed with DISH's interpretation of the faxes as a matter of law, finding that there was no other reasonable way in which to construe them. Even if the Jury disagreed with DISH's (and by extension, the Court's) interpretation of the faxes, it bears on whether DISH's conduct showed indifference or recklessness. As importantly,

whether conduct showed indifference or reckless disregard "focus[es] on something larger than whether" the individual plaintiff sustained damage, but more broadly would include a reckless disregard for the health and safety of others. *Williams*, 947 F.3d at 752.

To this end, DISH has a policy for honoring notices of attorney representation. (Tr., Jury Trial – Day 2, Afternoon Session, pp. 110:22-112:16.) But DISH did not believe it was triggered in this instance by virtue of how the faxes were phrased focusing on Plaintiff's bankruptcy (which DISH had already believed it had honored). (*Id.*, pp. 89:2-90:17.) Even if there were a "gap" in the policy such that DISH should have interpreted the faxes differently, this is not evidence or indication of reckless disregard for the health and safety of others.

As to the third factor, that Plaintiff had recently emerged from bankruptcy is evidence of at least some financial vulnerability. *See Williams*, 97 F.3d at 753. However, this must also consider the reality of the nominal amount of debt. This is not a case where DISH sought to foreclose on a home, repossess a motor vehicle, or collect some large sum of money. The total debt was $42. DISH did not report this to any credit reporting agencies or turn the account over to a third-party collection agency. (Tr., Jury Trial – Day 3, Afternoon Session, pp. 36:20-39:3.) DISH took no action except for sending five emails and making one (or

arguably two) phone calls to Plaintiff, and ultimately just wrote off the debt when it became apparent Plaintiff would not pay.

As to the third factor, this was an isolated incident. Invariably, Plaintiff will point to the fact that her counsel supposedly had to send three faxes. To start, it was only two during the relevant time period.[3] Regardless of whether it was one, two, or three faxes, it all stemmed from the same manner as to how DISH interpreted the faxes and their meaning. Whether an incident is isolated or not bears on whether DISH engaged in similar conduct with other persons beyond Plaintiff that would demonstrate a pattern and practice. *See Richardson v. Tricom Pictures & Prods.*, 334 F. Supp. 2d 1303, 1324 (S.D. Fla. 2004). Plaintiff introduced no such evidence of any remotely similar incidents.

The fifth factor weighs strongly against the imposition of punitive damages, as there is no evidence of intentional malice, trickery, or deceit. Indeed, the Court granted DISH's motion for judgment as a matter of law as to the issue of intentional misconduct, and only permitted the issue of gross negligence to be submitted to the jury. (*See* Tr., Jury Trial – Day 4, Morning Session, pp. 17:3-

---

[3] Plaintiff's counsel sent the third fax on February 16, 2015. (Tr., Jury Trial – Day Two, Afternoon Session, Jan. 24, 2023, pg. 51:16-19.). However, DISH had already written off the debt by February 13, 2015, three days earlier, such there was no communication after February 13, 2015. (Tr., Jury Trial – Day Three, Afternoon Session, Jan. 25, 2023, pg. 36:1-4.) Plaintiff originally testified that she thought she received a statement in August of 2016 (which was merely an internal DISH document), but ultimately admitted she did not know whether she received that statement. (Tr., Jury Trial – Date Two Morning Session, pg. 68:20-24.)

19:2.) Simply put, for the above reasons, "[a]t worst, Defendant acted recklessly, but without any intent to harm Plaintiff." *See Williams*, 947 F.3d at 754.

In sum, even if the Court finds that there was sufficient evidence to maintain a finding in support of some punitive damages and some of the above factors, the nominal at-issue conduct "was clearly not at the highest level of reprehensibility." *See id.* at 751-54 (finding that although three of five reprehensibility factors were met, the conduct "was clearly not at the highest level of reprehensibility," reversing district court's decision permitting a higher 13:1 punitive damages ratio, and reducing punitive damages to a 4:1 ratio).

## ii. The 26:1 punitive to compensatory damage ratio is constitutionally excessive.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580.

As the Eleventh Circuit has explained in summarizing the state of the law:

> [T]he shorthand guidance extrapolated from the Supreme Court's decisions is as follows. The Court has indicated that a ratio greater than 4:1 between punitive and compensatory damages will likely be close to the line of constitutional impropriety. Moreover, few awards exceeding a single-digit ratio (that is, anything greater than a 9:1 ratio) to a significant degree will satisfy due process. But the Court has emphasized that these are not hard and fast rules. Sometime even a 4:1 ratio may be too great. If, for example, the plaintiff has received a substantial compensatory damages award, then a lesser ratio as low as

> 1:1 may reach the outer limits of the due process guarantee and a punitive damages award that exceeds that ratio will be suspect. On the other hand, if a particularly egregious act has resulted in only a small amount of compensatory damages, then a greater ratio can be justified. Accordingly, we will operate under the assumption that a 4:1 ratio is the Court's suggested default guideline, but that this ratio may be adjusted depending on the above factors.

*Williams*, 947 F.3d at 754-55.

Here, the ratio between punitive damages ($225,000) to compensatory damages ($8,750) is nearly 26:1,[4] far in excess of the "default guideline" of 4:1. Applying a 4:1 ratio here, Plaintiff's punitive damages may not exceed $35,000.

The Eleventh Circuit held open the possibility for a slightly larger ratio in cases with low compensatory damages, but was equally clear that a "greater ratio can be justified" only if the defendant's conduct is "particularly egregious." *Id.*

While Plaintiff's compensatory damage award of $8,750 is not exceedingly high, it is certainly more than nominal actual damages and a "modest" sum. *See Williams*, 947 F.d at 757. More importantly, even if the damages were construed as nominal, there is no "particularly egregious" conduct that would support punitive damages above the 4:1 "default" ratio.

---

[4] While the Jury awarded $1,000 in statutory damages, the second *Gore* factor is predicated on the ratio between punitive damages "to the *actual harm*" sustained. *Gore*, 517 U.S. at 580 (emphasis added).

For example, this is not a situation of "intentional racial discrimination" where a plaintiff was repeatedly subjected to racial slurs, where the Eleventh Circuit has approved a 9:1 ratio. *See id.* at 756 (discussing cases).  In *Williams*, the defendant had wrongfully reported the plaintiff as a criminal, leading to multiple lost job opportunities, based on its flawed policies in complying with the Fair Credit Reporting Act. The Eleventh Circuit reduced the punitive damage award (5.9:1 ratio) to 4:1, concluding that "[w]e cannot infer that Defendant would have been on notice that its practices, slack though they were, would result in this level of punishment for a single plaintiff's injuries." 947 F.3d at 765.

Even if DISH's conduct "was sufficiently reprehensible to support an award of punitive damages, it was not, in the grand scheme of things, severely reprehensible," sufficient to justify a punitive damage ratio greater than 4:1, or as discussed below, 1:1. *See id.* at 763.

### iii. The disparity between the FCCPA's statutory damages and the punitive damages further supports reduction.

Finally, "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore*, 517 U.S. at 584. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord

'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.*

In *Gore*, the Supreme Court looked to the fact that Alabama's Deceptive Trade Practices Act provided for a civil penalty of $2,000 in weighing the excessiveness of the punitive damages imposed in that case. *Id.* at 584. The Court concluded that "[i]n  the absence of a history of noncompliance with known statutory requirements, there is no basis for assuming that a more modest sanction would not have been sufficient to motivate full compliance." *Id.* at 584-85.

Ultimately, the Court "need not dwell long on this guidepost." *Campbell*, 538 U.S. at 228. The FCCPA provides for civil penalties of up to $10,000 for violating Section 559.72. Fla. Stat. § 559.565. Plaintiff introduced no evidence showing a history of noncompliance by DISH of contacting persons after notice of attorney representation. Thus, the punitive damages "imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct," and "there is no basis for assuming that [the] more modest sanction" provided by the FCCPA was insufficient to promote compliance. *Gore*, 517 U.S. at 584.

### iv.  A 1:1 Ratio should be applied given the nature of this case, but in no event should greater than a 4:1 Ratio be applied.

As the Eleventh Circuit recognized in *Williams*, "[s]ometime even a 4:1 ratio may be too great." 947 F.3d at 754-55. This is one of those times. Even if the Court does not set aside punitive damages, an application of the *Gore* guideposts to this case would only "justify a punitive damages award at or near the amount of compensatory damages." *Campbell*, 538 U.S. at 429; *see also Richardson v. Tricom Pictures & Prods.*, 334 F. Supp. 2d 1303, 1321-27 (S.D. Fla. 2004) (reducing punitive damages to about $10,000, a 1:1 ratio with compensatory damages in a discrimination case); (*see also* Section III.C., *infra*.).

Notably, the Court entered judgment as a matter of law in DISH's favor on Plaintiff's claim of intentional misconduct, and only permitted the issue of gross negligence to be submitted to the Jury. (*See* Tr., Jury Trial – Day 4, Morning Session, pp. 17:3-19:2.) In issuing its ruling regarding punitive damages, the Court looked favorably on Judge Corrigan's decision and analysis in *Goodin v. Bank of Am., N.A.*, 114 F. Supp. 3d 1197 (M.D. Fla. 2015). (*See* Tr., Jury Trial, Day 3 – Afternoon Session, pp. 5:2-25, 126:13-17.)

To this end, as Judge Corrigan noted in *Goodin* when characterizing the state of the law, where a defendant "was grossly negligent but did not engage in intentional misconduct, a punitive award that mirrors the compensatory award is

appropriate." *Id.* at 1216 n.18. For these same reasons, the punitive damage award, if it is permitted to stand at all, should likewise be limited to a 1:1 ratio with the compensatory damage award. And in no event would the facts of this case possibly justify going above a 4:1 ratio.

III. <u>LAW & ARGUMENT</u>: **AFTER REDUCING PUNITIVE DAMAGES AS A DUE PROCESS MATTER, THE COURT SHOULD FURTHER REMIT BASED ON THE FACTS OF THE CASE TO THE EXTENT IT DOES NOT USE A 1:1 RATIO**

To the extent the Court does not limit punitive damages to a 1:1 ratio with compensatory damages as a due process matter, DISH requests the Court remit damages to the level of compensatory damages under Florida Statute § 768.74.

**A. Standard For Remittitur**

Under Federal Rule of Civil Procedure 59, "[w]hen it is determined that the damages awarded by a jury are excessive but the finding of liability is supported by the evidence, it is appropriate to order remittitur or a new trial limited to the issue of damages." *Holmes v. Collier Cnty. Bd. of Commissioners*, No. 2:09-cv-381-FTM-36SPC, 2012 WL 12951316, at *2 (M.D. Fla. Feb. 13, 2012) (Honeywell, J.), citing *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1256 (M.D. Fla. 2007); *see, e.g.*, *Gray v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-13603, 2017 U.S. Dist. LEXIS 215517, *9 (M.D. Fla. Oct. 26, 2017).

Florida law governs remittitur here, *see, e.g.*, *Gray*, 2017 U.S. Dist. LEXIS 215517 at *9, and specifically Florida Statute § 768.74, which provides:

> (5) In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria:
>
> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
>
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
>
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
>
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
>
> (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

Fla. Stat. § 768.74(5).

"Therefore, this court must determine whether the jury's punitive damage award is within the confines established by Florida law, and to determine by reference to federal procedural standards, developed under Rule 59, whether a

19

new trial or remittitur should be ordered." *Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *20-21(S.D. Fla. Oct. 31, 2007).

No single factor is dispositive. Rather, the Court must evaluate whether the amount awarded was excessive "in light of the facts and circumstances which were presented to the trier of fact." Fla. Stat. § 768.74(1). Here, DISH will attempt to discuss each set of facts under the most analogous factor under Section 768.74(5). Ultimately, whatever the root cause of the award and how these facts overlap with the relevant factors, the punitive damage award is excessive and untethered to any reasonable amount that could be justified in this case.

**B. Fla. Stat. § 768.74(5)(a), (b), (c): The amount awarded is indicative of prejudice, passion, or corruption, the Jury ignored the evidence or misconceived the merits of the case, and followed Plaintiff's request to "punish" DISH for its bankruptcy policy, independent and separate from the Section 559.72(18) claim.**

Plaintiff's closing statement and rebuttal are nearly 33 pages. (Tr., Jury Trial – Day 4, Morning Session, pp. 30:4-44:4, 70:24-71:4, 73:13-88:24.). Yet, Plaintiff's entire argument regarding Section 559.72(18) is comprised of only three pages, less than 10% of her argument. (*Id.* pp. 40:10-41:21, 82:17-84:8.)

In a vacuum, this fact alone does not necessarily mean much. But given the nominal time devoted to the Section 559.72(18) combined with other inflammatory comments of Plaintiff's counsel and the disparity between the

compensatory and punitive award, the totality of facts shows that the punitive damage award was the result of prejudice or passion, or at the very least that the Jury was attempting to "punish" DISH for its bankruptcy policy, independent of Plaintiff's Section 559.72(18) claim.

During closing argument, Plaintiff's counsel repeatedly claimed that DISH's bankruptcy policy—*not* its conduct with respect to Ms. Medley, but the policy itself—was "violative of this law on its face," and even went so far as to claim that the Court had determined that DISH's entire bankruptcy policy was illegal. (*Id.* pp. 39:9-10, 73:24-74:4, 79:16-23.) Indeed, over 22% of Plaintiff's closing statement (7.5 pages) was devoted to arguing that DISH's bankruptcy policy itself violated the law and that DISH applied this policy "50,000 times a year" to accounts. (*See id.* 37:5-23, 38:14-39:22, 44:1-6, 73:22-74:19, 75:20-76:22, 79:12-81:11, 86:2-87:3.)

But there was never any finding that DISH's bankruptcy policy itself violated the law, in 2014 or otherwise. To start, Plaintiff's representations ignored (and misrepresented) the fact that DISH changed its bankruptcy policy mid-process during Plaintiff's bankruptcy in 2014, and that those changes would avoid anomalous situations like Plaintiff's. (*See, e.g.*, Tr., Jury Trial – Day 3, Afternoon Session, pp. 21:11-26:19, 41:24-42:20.) It is unfounded to claim that

DISH had applied a policy unlawfully to 50,000 accounts annually up through trial (400,000 accounts in total for that time period).

For that matter, even before the mid-2014 bankruptcy policy change, it is inaccurate to claim that DISH's policy was illegal, let alone that this Court found it was illegal. The treatment of each DISH account differed under the bankruptcy policy depending on whether, *inter alia*, the person filing bankruptcy had an active accounts, an already disconnected account, and the results of their bankruptcy case. (*See* Joint Exhibit 10.) And the evidence showed that for even persons who had active account, nearly all *wanted* to remain DISH customers, and excepting Plaintiff's analogous situation, any other customers who wished to cancel their account did. The circumstances giving rise to Plaintiff's claim were unique, and Plaintiff introduced no other evidence of any allegedly similar "illegal" application of DISH's pre-August 2014 bankruptcy policy (let alone its post-August 2014 policy).

Perhaps even more importantly is the fact that Plaintiff did not make any plea for punitive damages with respect to her Section 559.72(18) claim. Instead, Plaintiff's request for punitive damages was *solely* sought as a means to "punish" DISH for its bankruptcy policy, *not* with respect to any post-fax communications.

> I want you to punish DISH Network because they have a policy which by their own admission they follow, 50,000 times a year, and is -- as

you have been instructed or will be instructed is in violation of the law. That is why they should be punished.

(Tr., Jury Trial – Day 4, Morning Session, pp. 73:24-74:4.)

> This is punitive damages. .. I would submit to you they have a policy that applies and is enacted 50,000 times a year, at least in 2014, and whether or not that policy, and in [] enacting that policy was gross negligence on the part of DISH Network, and I would submit to you based on the arguments I've already provided to you that they have -- that policy alone that they implement 50,000 times a year … [is] a policy that they knew and that they implemented in violation of the law and that policy
> …
> I'm not going to tell you what [award] you should pick. That is up for you to decide. But I believe, we believe that that number should be representative of how DISH has handled this policy for 50,000 customers yearly in 2014 and there forward. It should be commensurate with what the violation and the policy that is a clear violation of the law should be and that again is up for you to decide not for me.

(*Id.* pp. 86:2-87:3.)

While statements by counsel are not evidence, these inflammatory and unfounded statements patently made an impression that were considered and acted upon by the Jury.   Even though the Jury found that DISH did not have actual knowledge that Plaintiff's debt was invalid, the Jury latched onto Plaintiff's counsel's repeated claims that DISH's policy had been found illegal and his request that the Jury punish DISH *for its bankruptcy policy*—a request independent of the individual claims and wholly unconnected with the only claim

on which the Jury found DISH liable. In other words, even though the Jury found that DISH did not have actual knowledge that it attempted to collect an invalid debt, the Jury nonetheless decided to follow counsel's only request for punitive damages to "punish" DISH for its bankruptcy policy.

As further support indicative of passion and prejudice, the Jury's punitive damage award is not reasonable when viewed in relation to Plaintiff's Section 559.72(18) claim—the only claim on which she prevailed.

### C. Fla. Stat. § 768.74(5)(d), (e): The amount awarded bears no reasonable relation to the amount of damages proved and injury suffered, and is not supported by evidence that could be adduced in a logical manner by reasonable persons.

A review of amounts awarded in similar cases "has at least a limited value" when reviewing a punitive damages award against a claim of excessiveness, but each case must be "measured in the light of the circumstances peculiar to it." *Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 276 (Fla. 2018)

For example, in *Goodin v. Bank of Am., N.A.*, 114 F. Supp. 3d 1197 (M.D. Fla. 2015), the plaintiffs were awarded $100,000 in actual damages and punitive damages of $100,000 (a 1:1 ratio) when the defendant wrongfully foreclosed on the plaintiff's home. *Id.* at 1216.

And in *Barker v. Tomlinson*, No. 8:05-CV-1390, 2006 U.S. Dist. LEXIS 41566 (M.D. Fla. May 16, 2006), the plaintiff was awarded $10,000 in actual

damages and punitive damages of $10,000 (a 1:1 ratio) when the defendant falsely claimed that it had a warrant for the plaintiff's arrest, threatened the plaintiff with arrest if she did not pay her debt, and faxed a "request" for arrest to her workplace. *Id.* at *3-4.

DISH will not belabor the Court with additional examples because, as the Florida Supreme Court recognized in *Odom*, each case must be independently evaluated. But the reality is that the facts of this case are far more benign than those cases in which courts awarded a 1:1 punitive damage ratio, and an even farther cry from cases where any larger ratio was approved. This case does not involve threats of arrest, harassment, or wrongful foreclosure. It was five auto-generated emails and two voicemail messages, which Plaintiff ignored and for which DISH took no retributive action, ultimately just writing off the debt.

A $225,000 punitive damage has no relationship to the material facts or amount of damages proven and makes no logical sense given the facts of this case, particularly when there was no intentional misconduct by DISH.

Ultimately, where a defendant "was grossly negligent but did not engage in intentional misconduct, a punitive award that mirrors the compensatory award is appropriate." *Goodin v. Bank of Am., N.A.*, 114 F. Supp. 3d 1197, 1216 n.8 (M.D. Fla. 2015).

IV.    **<u>CONCLUSION</u>**

DISH's Motion should be granted.


Respectfully submitted,

Dated:  February 27, 2023          <u>*/s/ Eric Larson Zalud*          </u>
ERIC LARSON ZALUD (*Pro Hac Vice*)
DAVID M. KRUEGER (*Pro Hac Vice*)
LAURA E. KOGAN (*Pro Hac Vice*)
Benesch, Friedlander, Coplan & Aronoff LLP
200 Public Square, Suite 2300
Cleveland, Ohio 44114
216-363-4178 Telephone
216-363-4588 Facsimile
ezalud@beneschlaw.com
dkrueger@beneschlaw.com
lkogan@beneschlaw.com

Josef Y. Rosen, Esq.
Florida Bar No. 112719
GrayRobinson, P.A.
401 E. Jackson Street, Suite 2700
P.O. Box 3324
Tampa, Florida  33601-3324
813-273-5000 Telephone
813- 273-5145 Facsimile
josef.rosen@gray-robinson.com

Roy S. Kobert, Esquire
Florida Bar No. 777153
GrayRobinson, P.A.
301 E. Pine Street, Suite 1400
P.O. Box 3068
Orlando, Florida 32802-3068
407- 843-8880 Telephone

407- 244-5690 Facsimile
roy.kobert@gray-robinson.com

*Attorneys for Defendant DISH Network L.L.C.*

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for DISH has conferred with counsel for Plaintiff, who has advised that Plaintiff does not agree with the relief sought herein.

*/s/ Eric Larson Zalud*
Eric Larson Zalud
*Attorney for Defendant DISH Network L.L.C.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of February, 2023 I electronically filed the foregoing document with the Clerk of Courts by CM/ECF. I also certify that the foregoing document is being served this date on the following counsel of record in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing:

Ian R. Leavengood, Esq.
Michael J. Boyle, Esq
Philip M. Piazza, Esq
LEAVENLAW
Northeast Professional Center
3900 First Street North, Suite 100
St. Petersburg, FL  33703
consumerservice@leavenlaw.com
ileavengood@leavenlaw.com
mboyle@leavenlaw.com
ppiazza@leavenlaw.com

Charles Schropp, Esq.
Schropp Law Firm, P.A.
2309 MacDill Avenue, Suite101
Tampa, FL 33609
charles@schropplaw.com

*/s/ Eric Larson Zalud*
Eric Larson Zalud
*Attorney for Defendant DISH Network L.L.C.*