**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LINDA MEDLEY,

      Plaintiff,

v.                                 Case No: 8:16-cv-2534-CEH-CPT

DISH NETWORK, LLC,

      Defendant.

_____/

**O R D E R**

This matter comes before the Court on Defendant DISH Network, LLC's Renewed Motion for Judgment as a Matter of Law with Respect to Count II, Punitive Damages, and Emotional Distress Damages (Doc. 299), and DISH Network's Motion for Remittitur (Doc. 302). In the motion for judgment as a matter of law, Defendant requests the Court grant judgment in DISH Network's favor pursuant to Rule 50(b) as to Count II under Fla. Stat. § 559.72(18) of the Florida Consumer Collection Practices Act ("FCCPA") and as to Plaintiff's punitive and emotional distress damages. Doc. 299. Alternatively, DISH Network moves under Rules 50(b) and 59(a)(1) for a reduction in the $225,000 punitive damages awarded by the jury on the basis that the award is excessive and violates the Due Process Clause of the Fourteenth Amendment or for remittance under Florida Statute § 768.74(5). Doc. 302. Plaintiff Linda Medley filed responses in opposition (Docs. 313, 312), and DISH Network replied (Docs 317, 316). DISH Network also filed a notice

of supplemental authority. Doc. 318. The Court, having considered the motions and being fully advised in the premises, will deny Defendant DISH Network, LLC's Renewed Motion for Judgment as a Matter of Law with Respect to Count II, Punitive Damages, and Emotional Distress Damages and deny DISH Network's Motion for Remittitur.

## I.    BACKGROUND

Following a four-day trial on Plaintiff Linda Medley's ("Plaintiff" or "Medley") claims against Defendant DISH Network ("Defendant" or "DISH") for alleged violations of §§ 559.72 (9) and (18) of the FCCPA, the jury returned a verdict in favor of DISH as to Medley's claim under paragraph (9) and a verdict in favor of Medley as to her claim under paragraph (18). Doc. 283. The jury awarded Medley $1,000 in statutory damages; $8,750 in actual damages; and $225,000 in punitive damages for DISH's communication with Medley when it knew she was represented by an attorney regarding the debt DISH was trying to collect. *Id.* DISH now renews its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) and moves for remittitur of the punitive damages award.

### A.    Stipulated Facts[1]

On April 15, 2013, Medley and DISH entered into the "Digital Home Advantage Plan Agreement" ("DHA Agreement"), a Service Agreement, and a Residential Customer Agreement. Medley's DISH account number ended in -8000.

---

[1] These facts are taken from the parties' stipulations at trial and pretrial. *See* Doc. 282 at 7–8; Doc. 124.

As part of the DHA Agreement, DISH agreed to provide Medley satellite television services and equipment for a twenty-four-month term in exchange for monthly payments from Medley. When Medley entered into the DHA Agreement, she provided the telephone number ending in -2894. Medley is the owner of a cellular telephone with the assigned number ending in -9414.

On March 14, 2014, Medley called DISH from the -9414 number and elected to participate in the "DISH Pause" program, which allowed Medley to suspend DISH services under the DHA Agreement for up to nine (9) months for a monthly payment of five dollars ($5.00) plus tax. On April 18, 2014, Medley called DISH from the -9414 number and stated that she intended to file for bankruptcy. Medley also called on this date to change her telephone number on file and provided DISH the -9414 number. Medley, however, could not afford to pay the early termination fees provided for under the DHA Agreement and therefore did not immediately cancel her services.

On May 26, 2014, Medley filed her verified Chapter 7 bankruptcy petition in the United States Bankruptcy Court, Middle District of Florida, Tampa Division ("Bankruptcy Court") identified by case number 8:14-bk-05961-CPM ("Bankruptcy Case"). Medley listed "DISH TV" as an unsecured creditor on Schedule F of her Petition, listed "Satellite Service," and an amount of $831.74. On August 26, 2014, the Bankruptcy Court entered a Discharge of Debtor order in Medley's Bankruptcy Case ("Discharge Order"). The debt for Medley's DISH account number ending in -8000 was discharged in bankruptcy.

On October 15, 2014, Medley's counsel sent a fax transmission to the fax number ending in -3559, which is owned by DISH. On October 24, 2014; November 3, 2014; December 3, 2014; January 14, 2015; and February 14, 2015, DISH sent Medley billing notifications. On October 24, 2014; November 17, 2014; November 26, 2014; December 15, 2014; December 18, 2014; and January 16, 2015, DISH made telephone calls to Medley at the -9414 number. The calls were made using a prerecorded voice. On or about December 30, 2014, Medley's counsel sent another fax transmission to DISH's fax number ending in -3559. DISH complied with its bankruptcy monitoring procedures in place in 2014.

### B.    Medley's Trial Testimony

Medley was living in Kenneth City, Florida when she began her satellite TV service with DISH. Doc. 294 at 15. The only account Medley ever had with DISH was an account ending in -8000. *Id.* at 13. Her agreement with DISH provided that she "may cancel [her] services for any reason at any time by notifying [DISH] at the phone number, email address or mailing address set forth at the top of [the] agreement." *Id.* at 15.

Beginning in 2010, Medley was experiencing financial hardship and it was becoming increasingly difficult for her to pay her bills. *Id.* at 16. She had difficulty paying for rent and food, and in 2014 she moved out of her Kenneth City rental and moved in with a friend from church. *Id.* at 15–17.

In February 2014, Medley met with a lawyer to discuss filing bankruptcy because she had been getting collection notices and was worried about her credit and

her future. *Id.* at 17. After retaining the services of a lawyer, Medley contacted DISH two times to let them know that she was filing bankruptcy and wanted to cancel her account with DISH. *Id.* at 18. Although she wanted to cancel DISH's services, there was a cancellation fee that she could not afford. *Id.* at 19. DISH recommended the Pause program at a cost of $5 per month to keep the service. *Id.* Medley was not watching TV through DISH anyway since July 2013 as she had turned the service off and did not have the satellite receiver. *Id.*  Medley testified that she was not using DISH's services during the Pause program and had not used its services "for quite a few months." *Id.* at 20.

Medley called DISH back a second time to say she wanted to cancel her service because she had received another bill after retaining a lawyer and after telling DISH that she intended to file bankruptcy. *Id.* At the time Medley called DISH the second time, she was on the Pause program and had been charged $5 for the month of April 2013. *Id.* Her bill for the Pause program charges reflected the same account number ending in -8000. *Id.* at 21. She tried to cancel the DISH service but was connected to two additional DISH representatives and then the call was eventually disconnected after twenty minutes. *Id.* at 20.

Medley filed for bankruptcy, through counsel, in late May 2014. *Id.* at 22. A DISH debt, identified as account ending in -8000, in the amount of $831.74 was included in her bankruptcy filing. *Id.* at 23. She included DISH on Schedule F of her bankruptcy filing because she could not afford DISH's services, she did not want the

service, and she did not use the service in over eight months because she moved out of the Kenneth City rental and was living with a friend elsewhere who already had cable. *Id.* at 24. When Medley listed DISH on her Schedule F, she did not intend to continue DISH satellite services, nor did she intend to continue her relationship with DISH. *Id.* She intended to terminate her satellite services by including DISH in her bankruptcy filing. *Id.*

Medley testified to receiving bills from DISH in June, July and August 2014, after she filed for bankruptcy, in which DISH was charging her $5.35 for the Pause charges. *Id.* at 25–27. All the DISH bills, including those reflecting Pause charges, had the same account number ending in -8000. *Id.* at 26–27.

In August 2014, Medley received a notice from the Bankruptcy Court discharging her debts. *Id.* at 27–28. The Notice would have been sent to her creditors, including DISH. *Id.* at 28. When she received the discharge, Medley felt relieved and that she could have a fresh start to slowly rebuild her credit and build a better future. *Id.* She was under the impression that she no longer owed DISH or any other creditors listed in her bankruptcy. *Id.* at 29. However, DISH did not stop contacting her to collect a debt. *Id.* DISH emailed and called Medley multiple times asking for payment. *Id.* at 29–32. Medley testified that each contact would cause her heart to start racing and make her feel shaky, scared, and nervous. *Id.* at 33.

Medley told her bankruptcy attorneys each time DISH contacted her, and her attorneys communicated to DISH after each phone call that DISH was to stop

calling Medley. *Id.* Medley testified that each time she was contacted by DISH made her worried and she knew she "had a big problem with DISH." *Id.* at 35. She was concerned about her credit. *Id.* She filed bankruptcy to get a fresh start and DISH's continued collection efforts made her feel that it didn't work. *Id.* at 36.

Medley testified that the bills she received from DISH seeking payment after her bankruptcy still specifically referenced her same account number ending in -8000. *Id.* at 36–37. When she received these bills stating her bank account was going to be charged, it made her extremely worried. *Id.* at 37. She could not understand why her bankruptcy did not resolve this. *Id.* She testified that it was confusing and upsetting. *Id.* at 40. Her heart would start racing and she was worried about her credit and her future. *Id.* Medley acknowledged other worries going on in her life during this time, but she stated these other problems did not minimize her problems with DISH. Doc. 290 at 10.

### C.    DISH's Trial Testimony

DISH's corporate representative, Shannon Picchione, was the vice president of Billing and Credit Operations for DISH in 2014. Doc. 290 at 13. Her responsibilities at that time involved billing, credits, payments, delinquency, collections, bankruptcy, and all accounts receivable for DISH customers. *Id.* at 14–15. She testified she is familiar with bankruptcy laws and what a bankruptcy stay means. *Id.* at 15, 31. She did not go to law school and is not an attorney. *Id.* at 98.

Picchione testified that the Pause program is for the benefit of customers to keep the account alive even if they are not using the service for a period of time such as extended vacations or due to financial hardships. *Id.* at 22–23. If a customer calls to cancel, they are transferred to the "Loyalty Department" for DISH to understand why they are canceling. *Id.* at 24. The DISH account notes for Medley's account ending in -8000 reflected that Medley called DISH on April 8, 2014, stating she wanted to cancel her DISH service. *Id.* at 73. Despite Medley's calls to cancel, Picchione testified that Medley was put on the Pause program because that is what DISH thought she wanted. *Id.* at 85.

Picchione acknowledged that in May 2014 DISH would have received notice of Medley's bankruptcy filings, which included her attorney's name and address and which listed the DISH debt on account number ending in -8000. *Id.* at 26–29. No one from DISH attended the meeting of creditors, nor did DISH object to discharge of Medley's DISH debt in bankruptcy. *Id.* at 29.

DISH's internal account notes for Medley's account ending in -8000 reflected DISH received the Notice of Medley's bankruptcy from the bankruptcy court on or about June 13, 2014. *Id.* at 32. Bills dated July 1 and August 1, 2014, with Pause program charges for account number ending in -8000 were emailed to Medley post-notice of bankruptcy, prior to the discharge, and after DISH received notice that Medley was represented by an attorney. *Id.* at 33–35.

DISH received notice of Medley's discharge in bankruptcy by mid-September as reflected in the account notes for the account ending in -8000. *Id.* at 37. Picchione

8

identified bills dated October 2014, November 2014, December 2014, January 2015, and February 2015 that were sent after the discharge by DISH to Medley, while she was represented by counsel, regarding account number -8000, which sought to collect the $5.00 Pause charges. *Id.* at 42–46.

Picchione testified DISH received the fax communications from Plaintiff's counsel regarding Medley's DISH account ending in -8000 wherein counsel states he represents Medley regarding her bankruptcy debts and any other debt coinciding with account number -8000 and that any further communication with Medley by DISH is in violation of Florida Statute § 559.72(18). *Id.* at 47–52, 88. The three faxes of representation DISH received from Plaintiff's counsel are not referenced anywhere in DISH's notes for Medley's account ending in -8000. *Id.* at 88.

Picchione testified DISH has a bankruptcy monitoring system whereby a DISH customer's account would be documented if the customer files for bankruptcy. *Id.* at 53–54. Picchione testified that DISH annually receives 50,000 notices of bankruptcy from customers. *Id.* at 77. Laura Winkler joined DISH as a bankruptcy lead specialist in June 2014, and her responsibilities were to monitor the bankruptcies. *Id.* at 53. Picchione admitted that DISH account notes reflect DISH contacted Medley on several dates ranging from October 24, 2014 through January 16, 2015. *Id.* at 66–67. She further acknowledged that, during the relevant time, DISH did not offer any training to its employees regarding the FCCPA, its requirements, or actions that are precluded under the law. *Id.* at 70–71.

Joey Montano, DISH's Business Operations Manager, testified that DISH is a Fortune 200 company, meaning it is one of the largest two hundred companies in the United States. Doc. 295 at 82–83. It provides commercial and residential television service throughout the United States and Puerto Rico. *Id.* at 21. According to Montano, DISH has "millions of customers and agents." *Id.* at 24. Montano testified regarding the wide variety of training that DISH employees undergo, but he could not state the level of detail or whether employees received training regarding the Florida Consumer Collection Practices Act. *Id.* at 23–24, 61–62. In 2014, DISH had approximately 15 million subscribers. *Id.* at 83.

## II.    LEGAL STANDARD

### A. Renewed Motion for Judgment as a Matter of Law- Rule 50(b) Motion

Rule 50 provides in pertinent part:

(a) Judgment as a Matter of Law.

 (1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

> (A) resolve the issue against the party; and

> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

 (2) Motion. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

(b) Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under

Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(a)-(b).

### B. Remittitur

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

Under Florida law, in determining whether a jury's award is excessive in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages, courts consider (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact; (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable; (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture; (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and (e) Whether

the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.  Fla. Stat. § 768.74(5).

## III.   DISCUSSION

### A.   Renewed Motion for Judgment as a Matter of Law (Doc. 299)

A party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001) (citing *Slicker v. Jackson*, 215 F.3d 1225, 1229 (11th Cir. 2000)). DISH renews its Rule 50(b) motions for judgment as a matter of law as to (1) Plaintiff's FCCPA claim under § 559.72(18); (2) punitive damages; and (3) emotional distress damages. The Court addresses each argument in turn.

### 1.   Plaintiff's FCCPA Claim under § 559.72(18)

At trial, Plaintiff prevailed on her claim under Fla. Stat. § 559.72(18). Paragraph (18) of the FCCPA makes it unlawful for a debt collector to "[c]ommunicate with a debtor if the person knows that the debtor is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the debtor's attorney fails to respond within 30 days to a communication from the person, unless the debtor's attorney consents to a direct communication with the debtor, or unless the debtor initiates the communication." Fla. Stat. § 559.72(18).

DISH argues that the issue of its actual knowledge as it relates to Plaintiff's claims under (9) and (18) are overlapping. Given the jury's finding that DISH did not

have actual knowledge that the Pause debt was invalid, DISH contends the parties are returned to the same position they were in when this Court initially entered summary judgment. DISH next argues there was no evidence presented at trial that it had actual knowledge Plaintiff was represented by counsel with respect to the Pause charges. And, finally, DISH submits that the Court's finding in favor of DISH on the issue of intentional misconduct regarding punitive damages means the jury's finding of liability could only be founded on the concept that DISH "should have known" Plaintiff was represented by counsel, which is insufficient to establish actual knowledge.

In response to DISH's first argument that the verdict is inconsistent, Plaintiff maintains DISH waived any argument of inconsistency in the jury's verdict because no timely contemporaneous objection was made. In its reply, DISH responds that it is not making an inconsistency argument.[2] Doc. 317 at 2. Instead, DISH argues that because the sole basis for remand was related to the Pause charges and not the issue regarding representation of counsel, the parties are returned to their same positions as when the Court entered summary judgment initially on the paragraph (18) claim. Doc. 317 at 2. But the Eleventh Circuit remanded the case to this Court not only to

---

[2] Even if DISH were to make an inconsistency argument, such argument fails. As pointed out by Plaintiff, such arguments have been waived where DISH failed to challenge the consistency of the verdict prior to the jury being discharged. *See Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1259 (11th Cir. 2015) ("A party must object to a verdict as inconsistent before the jury has been dismissed."). "Indeed, failure to object to an inconsistent verdict before the jury is excused forfeits the objection." *Id.* (citing *Mason v. Ford Motor Co.*, 307 F.3d 1271, 1275–76 (11th Cir. 2002) ("[The defendant's] failure to raise its objection before the jury was discharged waived the right to contest the verdicts on the basis of alleged inconsistency.")).

consider whether DISH actually knew that the Pause charges were invalid, but also to consider whether DISH actually knew that Medley was represented by counsel regarding the debt DISH was attempting to collect. Doc. 97 at 12. On remand, the Court considered that issue in its March 25, 2022 summary judgment order, finding that questions of disputed fact existed as to whether DISH had actual knowledge that Medley was represented by counsel with regard to the debt it was attempting to collect. Doc. 175 at 18–19. Thus, the issue was submitted to the jury who, after listening to all the evidence and weighing the credibility of the witnesses, found that DISH had actual knowledge that Medley was represented by counsel with regard to the debt it was attempting to collect. Doc. 283.

DISH next argues there was no record evidence that DISH knew that Medley was represented as to the Pause debt, and thus the jury could have only based its verdict on a finding that DISH "should have known." In support, DISH relies on the jury's finding on the paragraph (9) claim that it did not have actual knowledge that the Pause charges were invalid. Additionally, DISH cites to its policy for processing and honoring notices of attorney representation. Lastly, DISH cites to the testimony of Shannon Picchione that DISH interpreted the faxes from counsel to be related only to Medley's bankruptcy debt, which it had already written off, and not related to the Pause debt.[3] Thus, DISH argues it did not have actual knowledge that Medley was represented by counsel as it relates to the Pause debt.

---

[3] DISH also argues that the Court in its initial summary judgment order agreed with DISH's interpretation that the Pause debt was a separate debt. The Court's prior order is not law of

Medley contends that DISH presents the facts from the viewpoint of the Defendant, inviting the Court to view the testimony and evidence in a light favorable to DISH, which is not the standard on a Rule 50 motion. To the contrary, on a Rule 50 motion, the Court views the evidence in the record and draws all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148–51 (2000).

Viewing the testimony regarding Medley's claim under paragraph (18) in Medley's favor, the Court cannot say that the evidence adduced at trial "is so overwhelmingly in favor of" DISH that a reasonable jury could not arrive at a contrary verdict. In a light favorable to Medley, DISH knew that she was represented by counsel when they contacted her regarding the debt they were attempting to collect.

At trial, the jury received evidence of the Notice of Medley's Bankruptcy that included the DISH debt on Medley's account -8000 and identified Medley's counsel. The jury heard evidence that DISH received Notice of Medley's Bankruptcy. Further, the jury saw three fax transmissions sent to DISH by Plaintiff's counsel reflecting that counsel's representation of Medley included "any other accounts of debts that [DISH] is attempting to collect from [Medley])." Doc. 285-1; 285-2; 285-3. Counsel's faxes of representation specifically reference the same account number (ending in "-8000") that was the subject of the debt discharged by the bankruptcy

---

the case on that point, and in any event, it certainly is not trial evidence considered by the jury.

petition. *Id.* DISH's corporate representative, Shannon Picchione, testified that all account notes were under account number -8000; the bankruptcy that was discharged was under the account number -8000; the contract that was signed by Medley was under the account number -8000; there was no other account number or contract assigned to Medley's account; and all notes pre- and post-bankruptcy referenced account number -8000. Doc. 290 at 33, 35, 43–46, 49, 50, 68, 72–74. The same Plaintiff's counsel that DISH knew represented Medley in her bankruptcy was sending cease and desist letters (post-bankruptcy) directed at DISH's collection efforts against Medley. DISH offered testimony that it had a policy in place honoring letters of representation, but the evidence at trial revealed that DISH did nothing in response to the three faxes from Medley's counsel, not even to record in the account notes that the letters of representation had been received. Doc. 290 at 88. And there was no record evidence that DISH ever attempted to contact counsel for clarification. Further, the jury heard from DISH that they do not train their employees regarding the requirements of the FCCPA or actions that are precluded under the law.

The jury heard testimony from Medley that she wanted to cancel her account, made multiple calls to DISH to cancel her account, saw evidence of DISH's internal account notes reflecting that she wanted to cancel her account, and heard testimony that Medley had no intention of continuing DISH satellite service or any relationship with DISH. Doc. 294 at 18–20, 24. Yet, the jury heard testimony from Shannon Picchione that DISH thought Medley intended to remain a customer. The jury also

heard that notwithstanding Medley's desire to cancel, Plaintiff was enrolled in DISH's "Pause" program. Doc. 294 at 19. The jury could weigh the credibility of these witnesses in the face of this conflicting testimony.

Although DISH claims it did not have actual knowledge that Medley was represented by counsel regarding the Pause debt it was attempting to collect, it was not a stretch for the jury to have rejected DISH's claimed misunderstanding regarding the faxes, particularly given the language—"and any other accounts of debts which [Dish] is attempting to collect"—contained in counsel's faxes.

Regarding DISH's final argument that the Court's rejection of Plaintiff's intentional misconduct claim by DISH precludes a finding of DISH's actual knowledge that Medley was represented by counsel, the argument is unpersuasive. DISH fails to cite legal support for this theory, and the Court rejects Defendant's premise that the only way the jury could have reached its verdict for Plaintiff on Count II is to find DISH "should have known," as opposed to actually knew, that Medley was represented by counsel. This ignores the likelihood that the jury simply rejected the testimony of DISH's employee that DISH misunderstood what the faxes from counsel represented.

Considering the facts adduced at trial, a reasonable jury could find, and did find, that DISH had actual knowledge that Medley was represented by counsel regarding the debt it was attempting to collect. And DISH fails to direct the Court to overwhelming evidence in the record that supports a contrary result.

### 2.      Punitive Damages

DISH next argues it is entitled to judgment as a matter of law under Fed. R. Civ. P. 50(b) on the issue of gross negligence and punitive damages. After finding in favor of Plaintiff on her claim under Fla. Stat. § 559.72(18), the jury awarded Plaintiff $225,000 in punitive damages. DISH claims this is error because (1) there was insufficient evidence of gross negligence by DISH itself; (2) there was insufficient evidence of gross negligence by Laura Winkler, the Dish employee who received the faxes from Plaintiff's counsel; and (3) even if there was some evidence to support gross negligence, the evidence was not clear and convincing.

Before deliberations, the Court instructed the jury on the issue of punitive damages. Specifically, the Court instructed:

> Punitive damages are warranted against DISH if you find, based on clear and convincing evidence, that DISH's employee or agent was guilty of gross negligence and (1) DISH   actively and knowingly participated in such conduct; (2) DISH's officers, directors or managers knowingly condoned, ratified or consented to such conduct; or (3) DISH engaged in conduct that constituted gross negligence and that contributed to the loss, injury, or damage suffered by Medley.
> . . .
> If you decide that punitive damages are warranted against DISH then you must decide the amount of punitive damages to be assessed as punishment against DISH and as a deterrent to others. This amount would be in addition to the compensatory damages you have previously awarded. In making this determination, you should decide any disputed factual issues by the greater weight of the evidence.
> In determining the amount of punitive damages to be assessed, you should consider the nature, extent and

degree of DISH's misconduct and the related circumstances, including the following:

(A)  whether the wrongful conduct was motivated solely by unreasonable financial gain;
(B)  whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by DISH;
(C)  whether, at the time of loss, injury, or damage, DISH had a specific intent to harm Medley and the conduct of DISH did in fact harm Medley.

Doc. 282 at 12–13.

Under Florida law, "gross negligence" means that the "defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(2)(b). DISH argues it had a policy for honoring notices of attorney representation, but believes the policy was not triggered here. Further, DISH contends that there was no evidence that the DISH employees acted with intentional misconduct or gross negligence. Even if DISH's reading of the faxes was erroneous, DISH urges that, at most, its conduct was a mistake and cannot be characterized as gross negligence.

Plaintiff responds that, under Defendant's Rule 50 motion, the evidence must be viewed in a light most favorable to the Plaintiff, as the non-moving party. Thus, Medley argues that in a light favorable to her the evidence supports the jury's award of punitive damages. Medley points to the fact that at no time in DISH's account notes for Medley does DISH document attorney representation. Although DISH claims to have a bankruptcy monitoring system and debt collection process, it makes

no reference of what to do in the case of cease-and-desist letters received from counsel. DISH received the Notice of Bankruptcy, the Notice of Discharge of Bankruptcy, and numerous letters from counsel, but wholly failed to document anywhere in its system that Medley was represented by counsel. Not only did DISH not document the three letters of representation received from counsel, but it also took no action to call Medley's attorneys (whose contact information was contained in the faxes) in an effort to discover the purpose of the faxes. To further exacerbate these failures, DISH at the same time was sending bills to Medley directly (as opposed to through her attorney) seeking to collect a debt—a debt which she finally thought she was free of. Such conduct by DISH supports a finding of a conscious disregard or indifference to Medley's rights not to be contacted by a debt collector when she is represented by counsel as to that debt.

As for DISH's argument that there was no evidence of Laura Winkler's gross negligence, Medley points out that in its Rule 50 argument to the Court, DISH took the position that it was its corporate representative, Picchione, whose conduct was in question. Specifically, Picchione was offered as the DISH witness responsible for creating, updating, and having oversight over DISH's bankruptcy monitoring policy. Doc. 290 at 15. And DISH claims there was no evidence of Picchione's misconduct. But the jury heard from Picchione that even to this day, she thinks that DISH handled things properly notwithstanding DISH's multiple failures to document attorney representation and DISH's multiple direct contacts of Medley despite her being represented by counsel. DISH made zero attempt to contact Plaintiff's counsel

for clarification about the faxes of representation. The attorney representation from the bankruptcy case was disregarded, and no action was taken on the faxes of representation. This inaction was systemic and condoned by Picchione, the non-lawyer responsible for oversight of the bankruptcy monitoring policy. DISH fails to demonstrate that the trial evidence is so overwhelmingly in DISH's favor on the issue of punitive damages that a reasonable jury could not arrive at a contrary verdict. Thus, DISH's Rule 50(b) motion as to punitive damages is due to be denied.

### 3.   Emotional Distress Damages

A plaintiff may recover actual damages for emotional distress under the FCCPA. *Fini v. Dish Network, LLC*, 955 F. Supp. 2d 1288, 1299 (M.D. Fla. 2013) (finding that a plaintiff can recover for emotional distress under the FCCPA); *see also Minnifield v. Johnson & Freedman, LLC*, 448 F. App'x 914, 916 (11th Cir. 2011) (finding the same under the Fair Debt Collection Practices Act). Here, the jury awarded Medley $8,750 in actual damages for her emotional distress.

DISH renews its Rule 50(b) motion as to Plaintiff's claim for emotional distress damages. DISH argues that Medley's testimony of feeling shaky, scared, nervous, and worried is inadequate as a matter of law to support the jury's award of emotional distress damages on Plaintiff's FCCPA claim. Several courts in this Circuit have declined to award damages for emotional distress where the plaintiff's testimony was not supported by medical bills. *Goodin v. Bank of Am., N.A.*, 114 F. Supp. 3d 1197, 1211–12 (M.D. Fla. 2015) (collecting cases). However, the *Goodin* court also noted that other courts have awarded actual damages for emotional

distress in FDCPA and FCCPA cases in the absence of medical treatment or testimony. *Id.* at 1212–13. Each case must be considered on its own facts. In *Goodin*, the plaintiffs did not present evidence from an expert or doctor and had not sought medical attention for their emotional distress. Notwithstanding, the court found their testimony credible as to the stress, anxiety, and sleeplessness that they suffered due to defendant's conduct, and the court awarded $50,000 to each plaintiff for emotional distress damages. *Id.* at 1213.

Here, the jury heard testimony from Medley as to her confusion, being upset, worry over her credit, and her heart racing. The Court observed Plaintiff was visibly shaken by her experience. The jurors similarly had the opportunity to observe the Plaintiff while testifying and to consider her testimony when weighing Plaintiff's credibility. After having done so, the jury awarded Plaintiff $8,750 for her emotional distress caused by DISH's conduct. In a light favorable to Plaintiff, there was a legally sufficient evidentiary basis for the jury to find in favor of Medley on the issue of emotional distress damages. Accordingly, DISH's Rule 50(b) motion on this issue is due to be denied.

### B.    DISH's Motion for Remittitur on Constitutional Grounds (Doc. 302)

DISH contends that no punitive damages were appropriate, but even if some punishment was supportable, DISH argues that $225,000, is constitutionally excessive and violates the Due Process Clause of the Constitution. Specifically, DISH argues that the $225,000 award, which is about twenty-six times the compensatory award of $8,750, is grossly excessive and should be reduced to a ratio

of 1:1 or at most 4:1 to pass constitutional muster. Doc. 302 at 6–9. As discussed above, the evidence supported an award of punitive damages. The purpose of punitive damages is for retribution and deterrence.[4] *Campbell*, 538 U.S. at 416. Here, the jury's punitive damage award of $225,000 against DISH is consistent with that purpose, without being grossly excessive. DISH's suggested award of $8,750 or, at most $35,000, would not have the intended deterrent effect on a company that is one of the largest two hundred companies in the United States.

While there is no "fixed mathematical formula for assessing whether a particular punitive damages award is so grossly excessive as to violate a defendant's due process rights," the Supreme Court has developed guidelines for the courts to utilize. *Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 761 (11th Cir. 2020). Under *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), courts reviewing punitive damage awards are guided by three factors: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties. *Id.* at 560–61.

---

[4] Florida has a strong interest in deterring unlawful debt collection practices. *See* 15 U.S.C. § 1692(e) (the purpose of the federal Fair Debt Collection Practices Act ("FDCPA") is to "eliminate abusive debt collection practices by debt collectors, . . .  and to promote consistent State action to protect consumers against debt collection abuses"); Fla. Stat. § 559.77(5) (FCCPA gives due consideration and great weight to the interpretations of the Federal Trade Commission and the federal courts relating to the FDCPA).

### 1.      Reprehensibility Analysis

The degree of reprehensibility of a defendant's misconduct is considered the most important of the three guideposts. *Williams,* 947 F.3d at 749. When conducting a reprehensibility analysis, courts take into consideration five factors: (1) whether the injury caused physical as opposed to economic harm; (2) whether the tortious conduct demonstrated an indifference to, or a reckless disregard of, the health or safety of others; (3) whether the target was financially vulnerable; (4) whether the conduct involved repeated actions; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell*, 538 U.S. at 419. All five factors need not be present to sustain a punitive damages award, but the absence of all five would render an award suspect. *Id*.

Because most of the factors are present here, DISH's conduct is at a sufficiently high degree of reprehensibility to constitutionally uphold the punitive damages award. DISH's conduct caused Medley physical injury; that likely demonstrated an indifference to the health and safety of others; was exacted upon a financially vulnerable target; and involved repeated actions. *See Campbell*, 538 U.S. at 419 ("reprehensibility grows more likely as more factors are present").

### a.      DISH's conduct toward Medley caused physical harm.

The first factor to consider in a reprehensibility analysis is whether the defendant's wrongful conduct caused physical harm or economic harm. When the harm to the plaintiff is physical, as opposed to merely economic, this favors a finding

that the conduct is reprehensible. *Williams*, 947 F.3d at 751.  Emotional distress may be considered a type of physical harm. *Id.*

In the instant case, DISH's conduct caused Medley to experience physical harm. Medley's emotional distress manifested itself in physical injuries. DISH caused her to feel worried and distressed. Medley testified that each time she would see an email or get a phone call, she would feel shaky and her heart started racing. Doc. 294, p. 40. While not life-threatening, such physical manifestations of emotional distress are appropriately considered and weigh in favor of a reprehensibility finding. *Williams*, 947 F.3d at 751.

### b.   DISH's conduct likely demonstrates an indifference to or reckless disregard of the health and safety of others

The second factor to consider when determining reprehensibility of a defendant's conduct is whether the defendant's tortious conduct demonstrated an indifference to, or a reckless disregard of, the health or safety of others. *Campbell*, 538 U.S. at 419. Conduct that suggests an indifference to an individual's emotional health can suffice in favoring a finding of reprehensibility. *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1219 (11th Cir. 2010). However, the mere fact that a plaintiff suffered emotional harm falls short of proof that the defendant's conduct represented an indifference to the health and safety of others. *Williams*, 947 F.3d at 752. Knowledge that their actions are causing another "undue stress" may demonstrate an indifference to the health and safety of others. *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1289 (11th Cir. 2018).

DISH's conduct likely demonstrates an indifference to the health and safety of Medley. Medley testified her emotional heath was damaged by DISH's conduct. *See Williams*, 947 F.3d at 752. DISH sent Medley multiple communications that may be considered adversarial. *See McGinnis*, 901 F.3d at 1289. Medley explained to DISH that she needed to cancel her DISH service to no avail. And Medley received repeated contacts by DISH, despite DISH's knowledge that she was represented by counsel and was forced to file bankruptcy due to financial troubles. Significantly, DISH testified that approximately 50,000 of its customers file bankruptcy each year. Thus, DISH is routinely dealing with individuals who are financially vulnerable. Given the lack of employee training regarding the requirements of the FCCPA or actions that are precluded under the law and the systemic failure to document attorney representation, DISH's conduct demonstrates an indifference to Medley, and presents a risk to the health and safety of others like her, who are at a low point in their lives and are most vulnerable. While a closer call, this factor weighs in favor of Medley.

### c.   Medley was financially vulnerable

The third factor to consider when determining reprehensibility of a defendant's conduct is whether the target of the conduct was financially vulnerable. *Campbell*, 538 U.S. at 419. A finding of financial vulnerability favors a finding that a defendant's behavior is reprehensible. *See id.* Where the targeted individual has "little income" or "struggles to make ends meet," courts similarly make a finding of

financial vulnerability. *See Williams*, 947 F.3d at 752. Additionally, financial vulnerability can be "reasonably inferred" from a party's circumstances. *Id*. at 753.

Medley testified that she was suffering from financial hardship and was having difficulty paying her bills. Doc. 294 at 15–16. She had to move out of her rental and move in with a friend. Medley filed a Chapter Seven bankruptcy proceeding during the period of the communications. She told DISH she was planning to file for bankruptcy, and DISH received notification of her bankruptcy. The evidence clearly supported that Medley was financially vulnerable, further supporting a finding of reprehensibility.

### d.    DISH's conduct involved repeated actions

The fourth factor to consider in the reprehensibility analysis is whether a defendant's conduct involved repeated actions. *Campbell*, 538 U.S. at 419. Conduct involving repeated actions, as opposed to an isolated incident, favors a finding of higher reprehensibility. *See id*. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful" favors a finding of a high degree of reprehensibility. *Gore*, 517 U.S. at 576–77. A defendant may engage in "repeated actions" by committing several acts or omissions that are not similar but have the same consequence. *See Myers*, 592 F.3d at 1220. Additionally, repeated contacts by phone or by mail may constitute repeated actions. *See McGinnis*, 901 F.3d at 1289.

DISH's conduct involved repeated actions by committing several acts or omissions that are not similar but have the same consequence. *See Myers*, 592 F.3d at 1220. DISH emailed, mailed, and called Medley, all of which had the same consequence of contacting and distressing Medley despite being on notice that she was represented by counsel and despite being prohibited from contacting her under Florida law. Moreover, Picchione testified that, to this day, she thinks that DISH handled things properly notwithstanding acknowledging DISH's multiple failures to document attorney representation and DISH's multiple direct contacts of Medley when she was represented by counsel.

DISH argues that this factor requires proof of similar conduct with respect to other persons. However, a tortious action repeated against a single plaintiff multiple times may suffice to satisfy this factor. *See McGinnis*, 901 F.3d at 1289. For example, in *McGinnis*, the defendant's repeated contacts to a single household regarding their payment defaults were adequate to constitute repeated conduct. In that case, the Eleventh Circuit stated "[Plaintiff] 'repeatedly notified [defendant] of errors in the handling of the account and attempted to resolve the errors in good faith.'  Each time, however, [defendant] refused to correct its error or justify the increase. Moreover, '[defendant]'s agents frequently' contacted [plaintiff] 'by phone and mail' such that according to [plaintiff], [defendant]'s demands became "a constant fixture of their lives." *See id.* Here, DISH received multiple notices that Medley was represented by counsel and nevertheless continued to contact her directly multiple times. This factor weighs in favor of a finding of reprehensibility of DISH's conduct.

28

### e.   Medley's harm was likely not the result of intentional malice, trickery, or deceit

The fifth and final factor to consider when determining degree of reprehensibility is whether the harm caused was the result of intentional malice, trickery, or deceit. *Campbell*, 538 U.S. at 419. Harm that was the result of intentional malice, trickery, or deceit, as opposed to mere accident, favors a finding of a higher degree of reprehensibility. *See id.* Willful conduct, which connotes more than mere accident, may display recklessness on behalf of the defendant but falls short of proving intentional malice, trickery, or deceit. *See Williams*, 947 F.3d at 754. Instead, "[t]his factor is looking at intentional misconduct – or something close thereto." *Id.*

Medley's harm likely was not the result of intentional malice, trickery or deceit. While the jury found that DISH had actual knowledge that Ms. Medley was represented by counsel during the communications in question, there was no evidence of intentional malice, trickery, or deceit. Medley's counsel concedes this factor does not necessarily weigh in Plaintiff's favor. However, as noted above, there need not be a finding as to all five factors to find a defendant's conduct reprehensible. In sum, DISH's conduct was sufficiently reprehensible to constitutionally uphold the punitive damages award, because a majority of the factors support a finding of reprehensibility, and all five factors need not be present to sustain an award. *See Campbell*, 538 U.S. at 419.

Having considered the reprehensibility of DISH's conduct, the Court's analysis turns to the disparity between actual or potential harm and the punitive damages awarded.

### 2. The disparity between the actual or potential harm and the punitive damages awarded.

The second guidepost in reviewing the constitutionality of an award of punitive damages is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award. *See Gore*, 517 U.S. at 560–61. Although the reprehensibility of a defendant's conduct is the primary factor in determining the constitutionality of punitive damages, courts should also consider this disparity due to the difficulty of attaching a monetary figure to a quantification of reprehensibility. *See Williams*, 947 F.3d at 754.

DISH argues that at most a ratio of four-to-one is the appropriate guideline. The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." *Gore*, 517 U.S. at 582. A higher ratio may be acceptable if the compensatory damages are low. *See Williams*, 947 F.3d at 755 (recognizing "higher ratios between compensatory damages and punitive damages are more reasonably justified when the former is for a relatively small amount of money"); *see also EEOC v. W&O, Inc.*, 213 F.3d 600, 609 (11th Cir. 2000) (upholding 26:1 ratio of punitive to compensatory damages where jury awarded one employee modest amount of back wages of $3,800); *Kemp v. AT&T Co.*, 393 F.3d 1354 (11th Cir. 2004) (reducing one-million-dollar punitive damage award to

$250,000 in case involving $115 in actual damages, with the reduced amount still constituting a ratio of over 2,100:1); *Johansen v. Combustion Eng'g, Inc.*, 170 F. 3d 1320 (11th Cir. 1999) (upholding punitive damage award that was approximately one-hundred times the compensatory award).

Further, to promote deterrence, courts recognize the economic wealth of a defendant may be considered. *Johansen*, 170 F.3d at 1338. A larger ratio may be needed for a damages award to serve its punitive purposes in cases when the defendant is a large and extremely wealthy corporation, especially when compensatory damages are relatively low. *See id.* The Eleventh Circuit recognizes the trial court's considerable discretion. *Williams*, 947 F.3d at 762 (holding that it is "ultimately up to the reviewing court to eyeball the punitive damages award and, after weighing the egregiousness of the particular misconduct and the harm it has caused, decide whether the award is grossly excessive").

The Court first notes that the compensatory damages here were relatively low. Medley was awarded $8,750 in compensatory damages. DISH is a large, wealthy corporation, with approximately 15 million subscribers throughout the United States and Puerto Rico. The jury heard evidence that DISH is among the largest two hundred companies in the United States. Remitting damages to a four-to-one ratio, as suggested by DISH, would result in a punitive damage award of a mere $35,000, which would be woefully inadequate to serve the intended deterrent effect of punitive damages on a company the size of DISH. On the facts of this case and the evidence

presented, a $225,000 punitive damage award against DISH was not grossly excessive.

### 3.  The difference between the punitive damages awarded by the jury and the civil penalties.

The third guidepost in reviewing the constitutionality of an award of punitive damages considers the difference between the punitive damages awarded by the jury and the civil penalties for similar conduct. *See Gore*, 517 U.S. at 560–61. In the instant case, application of this guidepost does not implicate a finding that the punitive damages awarded are constitutionally excessive. DISH cites to Fla. Stat. § 559.565, a civil remedy provision under the FCCPA that assesses up to $10,000 in fines for violations of § 559.72, Fla. Stat. However, the $10,000 fine is contained in paragraph (1) of § 559.565 and specifically refers to an "out-of-state consumer debt collector who collects or attempts to collect consumer debts in this state *without first registering*." Fla. Stat. § 559.565(1) (emphasis added). Failure to so register may subject the out-of-state debt collector to an administrative fine of up to $10,000 together with reasonable attorney fees and court costs in any successful action by the state to collect such fines. *See id.*

In contrast, paragraph (2), which assesses fines for violations of § 559.72 does not reference a specific amount of administrative fine. In pertinent part, Florida Statute § 559.565(2) provides that "[a] person, whether or not exempt from registration under this part, who violates s. 559.72 is subject to sanctions the same as any other consumer debt collector, including imposition of an administrative fine."

Fla. Stat. § 559.565(2). Thus, Medley argues that if the legislature intended to specify the value of the fine, they would have done so in a manner similar to § 559.565(1). While courts have found there may be a lack of adequate notice if the difference between the civil or criminal penalties that could have been imposed and the punitive damage award is too great, *see Gore*, 517 U.S. at 584, the $10,000 fine referenced in paragraph (1) does not apply to DISH and there is no maximum amount of fine referenced in paragraph (2). DISH does not direct the Court to authority to support otherwise. Moreover, if punitive damages were to be capped at $10,000 here, they would hardly serve the deterrent purpose for which they are intended, particularly given that Defendant is a Fortune 200 company.

### C.    DISH's Motion for Remittitur Under Fla. Stat. § 768.74 (Doc. 302)

Regarding a trial court's reduction of a jury's award, the Florida Supreme Court has stated, "[u]nder the general rule a verdict should not be disturbed on the ground of excessiveness unless it is manifestly so excessive as to shock the judicial conscience, or unless it is so excessive as to be indicative of prejudice, passion or corruption on the part of the jury, or unless it clearly appears that the jury ignored the evidence or misconceived the merits of the case relating to the amount of damages recoverable as, for example, by taking into consideration improper elements of damages." *Lassitter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1976) (quoting *Odoms v. Travelers Ins. Co.*, 339 So. 2d 196, 198 (Fla. 1976)). Whether the Court should reduce the jury's award as being excessive is discretionary based on the facts and circumstances of the case. "The [Florida] Legislature recognizes that the

reasonable actions of a jury are a fundamental precept of American jurisprudence and that such actions should be disturbed or modified with caution and discretion." Fla. Stat. § 768.74(6).

Reviewing courts consider the following factors in determining whether a jury's award is excessive under Florida law,:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
> (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

Fla. Stat. § 768.74(5). Applying these factors to the jury's verdict here, the punitive damage award was not excessive and does not shock the judicial conscience.

In support of its argument that the jury's award was based on prejudice, passion or corruption, DISH argues that counsel's closing argument was primarily focused on the paragraph (9) claim and only ten percent of Plaintiff's counsel's argument was directed to the paragraph (18) claim. DISH further argues that counsel, in his closing, did not request punitive damages with respect to post-fax communications, but instead requested punitive damages to punish DISH for its

bankruptcy policies. First, there was no objection asserted to counsel's argument at the time. Moreover, argument of counsel is not evidence, and the jury is so instructed. Where the jury heard evidence to support Plaintiff's claim for damages, the jury was entitled to award the amount it deemed appropriate notwithstanding counsel's closing argument.

DISH's motion does not vigorously challenge the second and third factors, which take into consideration whether the jury ignored evidence or speculated regarding damages. Indeed, the Court observed that the jurors were attentive during the trial: they paid attention to the testimony, asked thoughtful questions, appeared engaged throughout the proceedings, and spent considerable time deliberating.

Next, DISH argues that the amount awarded bears no reasonable relation to the amount of damages provided and injury suffered. In support, DISH cites cases wherein courts awarded 1:1 ratios for actual versus punitive damages. But, as DISH also recognizes, each case is to be "measured in the light of the circumstances peculiar to it." Doc. 302 at 24 (citing *Odom v. R. J. Reynolds Tobacco Co.*, 254 So. 3d 268, 276 (Fla. 2018)). The Court agrees with Plaintiff that this was not the case of a "runaway jury," but rather was one that rendered a punitive verdict that was large enough to potentially deter DISH's wrongful conduct but not so large as to bankrupt DISH or fail to satisfy due process. Given the facts and circumstances of the case, the Court finds that the jury's punitive verdict was not excessive, and the motion for remittitur is due to be denied. Accordingly, it is

**ORDERED**:

1.      Defendant DISH Network, LLC's Renewed Motion for Judgment as a Matter of Law with Respect to Count II, Punitive Damages, and Emotional Distress Damages (Doc. 299) is **DENIED**.

2.      Defendant DISH Network, LLC's Motion for Remittitur (Doc. 302) is **DENIED**.

3.      Within 14 days, Plaintiff shall file her replies to Defendant's response (Doc. 300) to Plaintiff's Motion to Determine Entitlement to Fees and to Defendant's Response (Doc. 301) to Plaintiff's Bill of Costs. Once the matters are ripe, the Court will enter an order lifting the stay related to the determination of fees and costs.

        **DONE AND ORDERED** in Tampa, Florida on August 25, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any